Counsel, you may proceed. Thank you, Your Honor. May it please the Court. My name is Craig Countryman for the petitioner. Your Honors, this is an asylum case in which the petitioner claimed to have been persecuted under China's one-child policy. Now, we've raised a number of issues in the briefs, and I'd like to discuss two today. The first being the agency's failure to consider Miss Tao's claim that she was persecuted for her resistance to China's one-child policy. And the second being the agency's erroneous use of a hearsay affidavit of a government investigator against Miss Tao. Counsel, where did you raise the resistance prong? You clearly raised the forced abortion prong, but where in your materials, in your brief, did you raise the resistance prong? To the agency. You mean, Your Honor? Well, anywhere. My question is, are we, can we look at that at this point, or has that been waived? I think we can look at it, Your Honor. It was certainly raised in both the blue briefs and gray briefs in this court. In the blue brief, in this court, starting at page 22. Page 22 in the blue brief? Through 28. Go ahead, keep going. And then in the agency, Your Honor, there was an argument by the government that this wasn't properly exhausted in the agency. Under this court's case law, and we cite the Moreno-Morante case in particular in our gray brief, the petitioner doesn't need to make the specific argument in the agency. It just needs to generally apprise the agency of enough facts for the agency to pass on the issue. But did the agency pass on the issue? It did not, Your Honor. And so what were the arguments in the agency that alerted the agency to the issue? So the argument would be the testimony and the declaration of Ms. Tao, where she said that when her state employer wanted to force her to wear an IUD, she first said she didn't want to wear it. That was verbal resistance, which under this court's case law would implicate the resistance prong of the statute. Then the employer forced her to wear the IUD anyway. She started experiencing back pain, abdominal pain, dizziness, all of which she testified about and was submitted to the agency. She then went back to her employer, and again, verbally resisted and asked to have the IUD be taken out. At that point, the employer's reaction was to first to report to higher management within the state organization that she was a troublemaker, and then to specifically say at company meetings to single her out as an example of a troublemaker and someone who, in Ms. Tao's words in her asylum application, dared to challenge China's one-child policy. So in your blue brief, you pointed us to page 22. Yes. Could you direct me to the specific language in here that lets us know that you are raising the resistance to the one-child policy issue? Sure. So page 22 of the blue brief, we set out that part of the statute. And then in pages 23 through 26 of the blue brief, we go through the evidence that was presented to the agency of her verbal resistance. But did you argue resistance to the agency? I believe we did because I believe in presenting the underlying evidence of showing resistance coupled with Ms. Tao's counsel citing in its briefs in the agency, the statutory provision, 8 U.S.C. section 1101A42. That was part and parcel of the asylum claim as well. So there was nothing to signal that there was an issue separate and apart from the asylum claim because it was the exact same evidence that was presented for the asylum claim. Well, I think there were different components to that. So certainly the main focus in the agency was on the claim about her being forced to have an abortion. And that's the claim that the immigration judge spent most time on and that a lot of the testimony was about. But in addition, the immigration judge also recognized a second component of the claim, which was that she was forced to wear the IUD. The judge talked about that. But that's part of enforcement of the one-child policy. Well, I would say under the statute, there's separate ways in which you could qualify as a refugee rather than persecuted under the one-child policy. Exactly. The statute gives you alternatives. And the problem here was that the agency only considered one of the alternatives, which was her claim that she had a forced abortion, but it didn't consider one of the other alternatives in the statute, which was that she had resisted. Well, they only consider that if it's brought to their attention. I mean, if the issue isn't clearly and distinctly raised before the agency, the agency doesn't have an obligation to sua sponte address it. And I would say, Your Honor, that it was raised because the petitioner put in evidence of her verbal resistance, that she didn't want to wear the IUD. Well, counsel, I'm looking at the respondent's brief in support of appeal to the BIA pages AR6 through about 14. Where in that brief does it say that you're raising the resistance prong? So it does not, admittedly, mention the resistance prong, particularly. The closest it comes is at the top of page A6, where it mentions the statute generally, and it says, the second paragraph, the second issue in this case is whether respondent is a refugee, as that term is defined in the Immigration and Nationality Act section. Well, that's the generic challenge. I mean, that's certainly not enough notice to the agency, is it? I think under this court's case law is. We cite the Moreno-Morante case in our great brief at pages three through four, that says. Forgive me, I'm having trouble understanding this issue, because she was found unworthy of belief. She was still wearing an IUD at the time of the hearing. And so even if it had been raised, the same rationale for denying her persecution claim would have denied her resistance claim, because her claim as to the underlying facts was not worthy of belief.  Because I think the immigration judge didn't find her not to be credible on everything. In fact, as you say, she found some aspects of Ms. Tao's testimony credible, namely that she's still wearing an IUD today, and other aspects of the testimony. Well, because that, by implication, makes extremely doubtful all her claims about how it's causing her pain and resistance and all like that. So why, here she is in the United States, and she's still wearing it. Well, I think it shows, frankly, that she was afraid to take it out, because if she were sent back to China, she might be punished. And in fact, there was a doctor's affidavit. How long was she in the United States at the time of the hearing, three years? Three years, I believe. If she had been ordered back to China, of course she could have had it put back in. But if she were believable in all the problems it's causing her, so she's going through three years plus of pain and suffering because of the possibility that she would be sent back and yet wouldn't have time to put it back in. Does that make any sense at all? I think it does, Your Honor, as someone who was suffering under this policy for two decades. And I would also say the immigration judge herself didn't question that the IUD was causing Ms. Tao pain and kind of acknowledged that and said, well, even if it is causing her pain, that still doesn't rise to the level of persecution because it's not enough pain. But the problem really is that the immigration judge believed some aspects of her testimony, but not others. And we don't know whether the immigration judge would have credited this part of her evidence if the agency had properly considered the issue. The second point I wanted to touch on briefly was the erroneous use of the hearsay affidavit of the government investigator. I don't think there's any dispute that the affidavit shouldn't have been admitted. There was no reasonable opportunity to cross-examine. The counsel made a timely objection to the immigration agency. We submit that it was prejudicial. The immigration judge heavily relied upon it in questioning Ms. Tao's credibility. The judge said, for example, at 830 that the, after saying, by the way, that this was a difficult case because Ms. Tao's written testimony and oral testimony were consistent, the judge then said, but she submitted this medical document, which, because it can't be authenticated, severely undercuts her credibility. The basis for saying that the document could not be authenticated was this hearsay government investigator's affidavit. And in fact, the government, at the hearing, basically used the affidavit to accuse Ms. Tao of lying. But the BIA later on said that, in affirming the adverse credibility, they were not considering that. Right, so there's a couple aspects of that. On direct review, actually, this issue was squarely raised to the BIA, and the BIA did not comment upon it one way or the other. In fact, it said, we agree with the immigration judge's credibility finding, the BIA on direct review cited the totality of the circumstances surrounding the manner and presentation of her claim and cited all the pages of the immigration judge's opinion, including the pages where the judge used this hearsay affidavit against Ms. Tao. Now, what you're referring to, Your Honor, is then on a motion to reopen, when a different board member of the Board of Immigration Appeals came along later and tried to reinterpret the BIA's opinion on direct review and say, well, really, we were basing it on some other basis. We weren't basing our affirmation. I mean, you're suggesting that, in effect, when you say reinterpret, I think you're suggesting he or she was lying. But that's, why should we remotely draw that inference? They cite to the whole portion. And then when the issue is sort of pinpointed for them on the further motion, they say, well, in fact, we didn't rely on the specific part of that great totality, we relied on the rest. Why should we discredit that? Because I think here we're reviewing the board's opinion on direct review. And this issue was presented to the board on direct review, and the board on direct review did not say anything about the hearsay affidavit. Yeah, so it was left unclear, but once the issue on the motion to reopen is presented to them dead on, then they clarify. I would say it wasn't unclear. I think when they said, we agree with the immigration judge's finding, when they said, given the totality of the circumstances and cited all the pages, including the pages where this hearsay affidavit was relied upon, I think that's entirely clear in the board's opinion on direct review. And the issue was pinpointed for them on direct review twice in the petitioner's brief. Unless there are further questions, I'll save my remaining time for a follow-up. You may do so, counsel. Thank you. We'll hear from the government. You may proceed, counsel. May it please the court, my name is Jocelyn Wright. I'm here on behalf of Respondent, United States Attorney General. The one issue that petitioner did not address in her argument today is the dispositive one for both the immigration judge and the board, and that was petitioner's lack of credibility. The immigration judge, let me first clarify a couple of things. The immigration judge did indeed find her lacking in credibility and discussed the... Are you suggesting that if we agree with you on the credibility issue that disposes of the case that we don't have to reach the other issues? That's correct, Your Honor. All right. We believe that the adverse credibility determination is dispositive, but I will address the other resistance claim and the forced abortion, the other issues that he discussed in a few seconds. I just wanted to clarify first on the adverse credibility. What both the immigration judge and the board did in this case was it treated this case essentially as it does any other immigration case that comes before it. There were inconsistencies between Ms. Dow's testimony and the documents that she had submitted in support of her asylum claim. There was the lack of authentication didn't come into play with respect to either the immigration judge or the board's analysis because the immigration judge specifically said, this document can't be authenticated. The investigator for CIS has sent a report and said she thinks it's not an authentic document, but all the immigration judge said is this is a document that cannot be authenticated. And so to the extent that petitioner was submitting that document to support her claim, to corroborate her claim of forced abortion, it certainly didn't strengthen it. And that was the extent of the reliance on the document that both the immigration judge and the board did. That's the amount of weight that they placed on it. You're talking about the she affidavit? No, the document. Yes, the she affidavit. All it said was you can't authenticate it because the immigration judge said in her decision that petitioner couldn't be held to account for submitting a document that she didn't know was fake, even if the she affidavit was given credence. And so, and there is case law in this court that says if she doesn't know that it's fake, she can't be penalized for it. And the immigration judge acknowledged that and said, but even if we can't penalize petitioner for the fake document, the fact remains the document that she submitted to support her claim of a forced abortion simply didn't support it. And in fact, undercut it because it is inconsistent with the testimony that she provided in person at her hearing. And those inconsistencies were, that the petitioner didn't discuss today, was that she said that she had visited the doctor, according to her testimony, she visited the doctor in middle of December, 1997, which meant that she, and found out that she was pregnant in violation of the one-child policy, which of course, then the direct consequence of that is that her last menstrual period would have been sometime in November. And then, according to her document that she submitted to corroborate the forced abortion, she said that, in fact, her last menstrual period, the medical records said her last menstrual period was December 20th, 1997, which was even after when she first said that she discovered the pregnancy. And so, given that this was something that came from her completely, to corroborate what she said happened to her, the immigration judge and the board reasonably relied on the inconsistency between that testimony and the document that she submitted to support the existence of this forced abortion, to find that she lacked credibility. With respect, and then the second. Why wasn't the author of the affidavit called? Oh, the investigator wasn't called because Petitioner didn't indicate any kind of request to have her available for cross-examination. And the record reveals that DHS submitted the she affidavit in May of 2008. The merits hearing was not held until October 31st, 2008. Between May and October, during that five months, Petitioner, who was represented by counsel at all times, never submitted any kind of objection, written or verbal, to request that, one, the investigator be made available for cross-examination, nor did they file any kind of motion to strike the affidavit for lack of foundation. They didn't request any kind of issuance of subpoena. Nothing happened during those five months. And so, although she had ample opportunity to do any of those things, and even to rehabilitate her credibility, given the fact that she knew that she had submitted an affidavit, but said that her corroborating evidence lacked authenticity, she never submitted any kind of rebuttal evidence, although she could very easily have done that. For example, she could have submitted an affidavit from her husband, saying, no, this really happened. I was there during that time, this is what happened, and here's what I remember. And the husband could also have explained his efforts to try and find, to find a replacement document for the medical record, the she affidavit said lacked authenticity. None of that was ever submitted into the record. And so, to the extent that she's arguing that she was prejudiced, or that the government didn't provide sufficient opportunity for her to rebut the she affidavit and its contents, I don't think the record bears that out. With respect to the... Let me just make sure I understand. Are you saying that at no time did she raise any objection to the admissibility of the record of the affidavit on the ground, that it was hearsay, or? Oh, no, she did. She did? Between May and October 31st. Well, but she already raised the objection. What more does she have to do? Well, she raised the objection at the hearing itself on October 31st. And the only objection that her counsel raised was that it was hearsay. Which it was. Which the judge said was, that's correct, but hearsay is admissible. Yes, but then under the Ninth Circuit precedent, that there are limitations on that. So, well, all right, go ahead. There are limitations, Your Honor, but again, her objections went to wait. And again, our position here is that the way that the government, I'm sorry, the way that the immigration judge and the board placed on the she affidavit wasn't sufficient to prejudice her, because again, all they said was the she affidavit concluded that it lacked authenticity, but all we're saying is, it can't be authenticated. It hasn't been authenticated. Very well. The last issue that I do want to clear up is Petitioner's claim that the other resistance issue, although he has, counsel has argued that Petitioner at all times said that she didn't want to wear the IUD, the record, again, doesn't bear that out. Her affidavit, in support of her application for asylum, is an administrative record in page 180. Paragraph four of that says, all it says is, I wish to have an intrauterine device inserted within a month. I filled out the form for a single-child certificate and signed the contract. I agreed to have the IUD insertion at the clinic. I complied so that I would have no problems returning to work. At the hearing, she testified, and this is an administrative record, page 94. She said, she was asked, did you have the IUD inserted? And she said, yes. Was that your decision? No, it was a family planning policy. Everyone complied with the policy. There was absolutely nothing in the record to put the government on notice that she was going to be pursuing an other resistance claim. And in fact, all the record shows is that she, at most, what the board has characterized as simple grudging compliance in its precedent decision in MFW. She waited until she was age 26 to marry her husband. That was in compliance with the marriage age policy. She complied with the IUD insertion, as I just discussed. And she never took out the IUD because the family planning officer told her she couldn't do it. She made absolutely no overt efforts to have the IUD removed, despite the prohibition on having its removal. And in fact, to this day, she has complied with that policy because, according to her affidavit, in case she is sent back to China, she doesn't want to have to go through another IUD insertion. Counsel, may I ask you about the adverse credibility determination? Would you agree that the determination rested largely on discrepancies in dates? The inconsistencies in dates, yes. Yeah, so what do you say about our cases that talk about the fact that inconsistencies in dates are not necessarily indicative of an attempt to enhance the application? And that is certainly the case law in this circuit, Your Honor. However, there is also a case law that says that it's not completely irrelevant. And so the devil is in the details in some of these asylum cases. And to the extent that the December appointment with the doctor was so important because that's when she discovered she was pregnant and how long her pregnancy had been in existence, that was important. And so it wasn't a minor inconsistency, but it was an inconsistency that, in fact, affected the veracity of the claim because it put into doubt whether or not it actually did happen the way she said it happened and whether it happened at all. Unless the court has any further questions. Yes, the petition will be denied. Thank you, counsel. Mr. Countryman, you have a little reserve time. Thank you. Thank you, Your Honor. Just a couple points. First, on the other resistance prong, the affidavit that counsel's reading from, a couple later portions of that affidavit did press the other resistance claim. For example, at record A181, paragraph five of that declaration, Ms. Tao said that she asked the state employer after she'd initially agreed to have the IUD inserted, she then asked the state employer to postpone implantation of the IUD. When it was nevertheless implanted anyway, paragraph seven of that declaration, she then said that she went back to them and asked to have it removed. Those two acts alone are verbal resistance. And the fact that she didn't then go and go to the additional length of actually having it removed doesn't matter because under this court's case law, we cited at pages 23 and 24 of the blue brief, the verbal resistance alone is enough to qualify under that part of the statute. Going back to the affidavit, we think it was prejudicial to admit it. The immigration judge flat out said, this is a difficult case. Her declaration and her oral testimony are consistent in many ways. And the judge then said right after that, but we have this unauthenticated medical document that seriously undercuts her credibility. The board kind of later in the motion to reopen says, well, there were these alternative bases for this credibility finding. But really, that's appellate fact finding, which the board isn't allowed to engage in. The bottom line is this case may have come out differently if the immigration judge had applied the right law on. So what's your objection to the affidavit? So she should have had an opportunity to cross examine. Well, she did have the opportunity, did she not? Under this court's case law, the government has to affirmatively make the witness available. So in an immigration context? I think so. Okay, give me the strongest case from this circuit in the immigration context that says that the government has to make a witness available who has submitted an affidavit of nonexistence. I will, Your Honor. Page 30 of our blue brief, we cite the Sade Dane and the Cunanan and Hernandez. Okay, what's the strongest? What's the absolute strongest case for your proposition? I would say the Cunanan case and the quote. What's the citation? It's 856 F2D 1373. And it says, because the government's failed to make any reasonable effort to produce Sandra Keese's hearsay declarant, the BIA's reliance on those documents is fundamentally unfair. But there was no objection at the time. There was an objection at the hearing, Your Honor. Record A141 and 142, and again for the BIA. Now the case you're talking about, was that a fact witness or was it a witness? I make a distinction in my mind between a fact witness who's talking about the pertinent facts of the case, the persecution, and a witness who examines records and says there was no record of this. The case that you're citing, was that a fact witness or was it a witness who had examined records and said that there is no evidence of a record? Do you recall? I don't recall, Your Honor. I think there's a distinction in the case, Law. I would say we don't see a distinction because I think either way, the hearsay information's being used against her, without her being able to confront the witness. I think the harm. You don't think the best case for you is Hernandez-Guadarrama versus Ashcroft at 394 F3rd 674? I think that's also a strong case. I think it says exactly the same thing as the Cunanan case. We cited, in a page three of our brief, we quote, Hernandez excluded the declaration where, quote, the government failed to make any reasonable effort to produce the hearsay declarant, the declarant. So again, the onus, I would say, is on the government. Okay, so what, if this witness were presented, what questions would be asked of that witness? So I think we could probe, Ms. Talbot could proffer this alternative explanation that the original medical record had been lost, so she went and sent her husband back to the hospital to get this record. That witness wouldn't know anything about that. Well, this witness did claim to have expertise in the types of records that Chinese medical hospitals deal with, and put a bunch of questions, allegedly, to the hospital in China. The witness could have been asked, well, do you have experience? Do Chinese hospitals issue this type of record? In your experience, as the expert you hold yourself out to be, is this a plausible counter-explanation? I mean, the witness essentially assumed, erroneously, that Ms. Talbot was putting this in as an original medical record, and the witness kind of did the expert analysis, you know, basing, using that assumption. If that assumption had been challenged on cross-examination, the witness's testimony could have been illuminative, and could have supported Ms. Talbot's explanation. All right, thank you, counsel. Your time has expired. The case just argued will be submitted for decision, and we will argument in the last case of the morning, which is St. Vincent Medical Center versus Megalife.
judges: Rakoff, O'SCANNLAIN, RAWLINSON